Filed in Open Court
1/23/2026
Skyler B. O'Hara
By  M. Dalton
Deputy

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| **Plaintiff,** | |
| v. | Case No. 24-20067-HLT |
| CARLOS NIEBLA-MACHADO, | |
| **Defendant.** | |

## PLEA AGREEMENT PURSUANT TO FEDERAL RULE
## OF CRIMINAL PROCEDURE 11(c)(1)(C)

The United States of America, by and through Assistant United States Attorneys Trent M. Krug and D. Christopher Oakley, the defendant, Carlos Niebla-Machado, personally and with his counsel, Lydia Krebs Albert, hereby enter into the following plea agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure:

1. **Defendant's Guilty Plea.** The defendant agrees to plead guilty to Count 1 of the Indictment. Count 1 charges a violation of Title 18, U.S.C. §§ 1201(a)(1), 1201(d), and 2, that is, Attempted Kidnapping. By entering into this Plea Agreement, the defendant admits to knowingly committing the offense, and to being guilty of the offense. The defendant understands that the maximum sentence which may be imposed as to Count 1 of the Indictment to which he has agreed to plead guilty is not more than 20 years of imprisonment, not more than a $250,000.00 fine, not more than 5 years of supervised release, and a $100.00 mandatory special assessment. The defendant further agrees to not contest the forfeiture allegation, as fully set forth in ¶ 9.

2. **Factual Basis for the Guilty Plea.** The parties agree the facts constituting the offense to which the defendant is pleading guilty are as follows:

Ver. 03-01-24

Commencing on or about February 22, 2024, a KBI undercover agent (hereinafter referred to as "UCA") was contacted by a confidential informant (hereinafter referred to as "KBI CI") about a subject possibly selling large amounts of methamphetamine and fentanyl in the Kansas City metro. The KBI CI said he/she met the subject, later identified as Carlos Niebla-Machado (hereinafter referred to as "the defendant"), when the KBI CI inquired about a tow truck the defendant had for sale. The meeting occurred at the defendant's residence in Kansas City, Missouri. The defendant claimed he had contacts to bring fentanyl pills and methamphetamine from California to the Kansas City metro. The KBI CI said he/she knew someone, specifically the UCA, who would be interested in purchasing controlled substances from the defendant. The KBI CI recorded this interaction with the defendant and shared it with the UCA.

On the morning of February 26, 2024, the KBI CI met with the defendant again. During the ensuing conversation, the defendant said he (the defendant) wanted to have an unidentified Jamaican male kidnapped as the male owed a $300,000 drug debt to the defendant. Investigators later identified the Jamaican male (referred to throughout this factual basis as "D.W.B."). The KBI CI said he/she observed the defendant in possession of a firearm during their interaction. The UCA instructed the KBI CI to tell the defendant he/she knew someone (the UCA) willing to do the kidnapping-for-hire and would like to meet the defendant the following week.

A few days later, the KBI CI unexpectedly met with the defendant again and said the UCA would be willing to kidnap D.W.B. The defendant asked how much the UC would charge for the kidnapping. The KBI CI speculated it would likely be between $10,000 to $15,000. The defendant wanted the UCA to kidnap D.W.B., so D.W.B. could be forced to sign over all D.W.B.'s property to the defendant.

On the afternoon of March 6, 2024, the UCA and KBI CI met with the defendant at the defendant's Kansas City, Missouri residence. During the meeting, the defendant confirmed he wanted the UCA to kidnap D.W.B., if he (D.W.B.) did not pay the $300,000 drug debt. The defendant wanted to force D.W.B. to sign over real estate and vehicles towards the debt. The defendant asked about the kidnapping's cost and said he (the defendant) did not want the UCA to do anything yet because he (the defendant) hoped D.W.B. would just pay. The defendant said he had already started obtaining property from D.W.B. The defendant had a tow truck parked in front of his residence, which he claimed was obtained from D.W.B. The UCA agreed to do a straight kidnapping for $10,000, but the price would increase if the defendant wanted more done. The UCA said he (UCA) would obtain the defendant's cell phone number [(816) 927-5143] from the KBI CI after the meeting. The UCA told the defendant he/she would do the kidnapping for either multiple kilograms of methamphetamine or cash. The defendant ended the meeting by agreeing to wait and see if D.W.B. paid him before taking any action.

On April 3, 2024, the UCA attempted to contact the defendant regarding the kidnapping-for-hire and drug distribution investigation. At 3:44 p.m., the UCA sent the following text message to the defendant's (816) 927-5143 number: "What's up my friend it's Vaquero we met a couple weeks ago at your house. Did you ever get anymore stuff in from Cali (meaning methamphetamine)? Also did you get your money issue taken care of with your other guy." The defendant never responded to the text message. After several days, the UCA contacted the KBI CI. The KBI CI said he/she recently spoke with the defendant and the defendant said D.W.B. had paid some of the money, so the kidnapping-for-hire was not going occur.

On May 31, 2024, the KBI CI and KBI CI2 met with the defendant. During the meeting, the defendant told the informants that he was now ready to have the UCA move forward with the kidnapping plot. However, the defendant now wanted the UC to torture D.W.B. and then transport him to Mexico, where the defendant and his criminal associates would turn him over to the cartel,

so that they could force him to sign over his property. The KBI CI agreed to contact the UCA about the kidnapping. The UCA subsequently coordinated a meeting with the defendant on June 11, 2024.

On the afternoon of June 11, 2024, the UCA (Primary UCA), UCA2, and KBI CI met with the defendant in Cabela's Sporting Goods parking lot in Kansas City, Kansas. The meeting occurred in the UC's undercover vehicle and was both audio and video recorded. During the meeting, the defendant repeatedly asked if the UCAs were "the police." After the UCAs said they were not law enforcement, the defendant indicated he wanted the UCA to move forward with the kidnapping and torturing plan. The defendant provided the UCA with the victim's full name, age, Kansas City, Missouri residential address, two photos of D.W.B., the victim's background information, and two photos of D.W.B.'s vehicle. The defendant also indicated he wanted D.W.B. tortured by cutting D.W.B.'s fingers off and a using a torch on D.W.B.'s face to persuade D.W.B. to sign over property as payment toward the $300,000 drug debt. The UCA said he could do the kidnapping, but was unsure how that helped the defendant get his money back. The defendant asked if the UCA could obtain a notary and he (the defendant) would take care of the paperwork showing the transfer of the properties D.W.B. had purchased. The defendant wanted to know what the UCA would charge. The UCA said if the defendant wanted D.W.B. kidnapped and tortured, the UCA had a place in mind, but it was out in the country in Kansas. The defendant confirmed he was fine with the arrangement. The defendant agreed to give the UCA a new FN Five-Seven 5.7 pistol and his silver 2004 Dodge Ram truck as down payment toward D.W.B.'s kidnapping and torture. The remainder of the agreed-upon cost, which was not specified during the undercover meeting, would be collected later. The UCA and the defendant also discussed getting "clean" cellular telephones, so the two could communicate without the phones directly tied to the UCA or the defendant. The UCA agreed to the payment arrangement and to meet with the defendant on June 14, 2024, at 1:00 p.m., to pick up the pistol, truck, and truck title as payment for D.W.B.'s kidnapping and torture.

On the afternoon of June 14, 2024, the UCA, UCA2, and the KBI CI met with the defendant in the Cabela's Sporting Goods parking lot (Kansas City, Kansas). The UCA examined the 2004 Dodge Ram pickup the defendant offered to trade. After the examination, the UCA, UCA2, KBI CI, and the defendant all entered the UCA's vehicle. The UCA said they had been working on the defendant's problem (D.W.B.). The UCA then showed the defendant several cell phone photos (taken by KBI agents) of D.W.B.'s residence and vehicle. The defendant said D.W.B. would be scared and will "scream like a baby." The UC then asked the defendant if he also had the pistol he was going to trade to the UC. The defendant said he had the pistol and the title for the Dodge truck. The defendant removed the truck's title from his shirt pocket. The UC examined the title and immediately noted the truck's title was in D.W.B.'s name. The defendant later confirmed the Dodge Ram truck came from D.W.B. The defendant exited the undercover vehicle, returned to his truck, and retrieved a FN Five-seveN pistol (a 5.7x28mm pistol, with serial number DTU3630). The defendant brought the pistol and gun case back to the undercover vehicle, where he handed it to the UCA. The UCA examined the pistol, which was unloaded, and noted the pistol appeared to be new. The UCA then provided the defendant with the UCA's cell number for future communications. The defendant said he was going to get another phone. The defendant said he now wanted to take $400,000 from D.W.B. for his troubles dealing with this issue. The UC asked if the defendant wanted to be involved with torturing D.W.B. The defendant said he was too old for that. The defendant said that once D.W.B. was kidnapped, he wanted to talk with D.W.B., so the defendant could figure out the location of houses he (the defendant) wanted signed over. The defendant wanted to know if the UCA had found a notary to use for the property documents he

3

was going to have D.W.B. sign. The UCA confirmed he/she had a notary. The UCA and the defendant agreed to meet the following week, so the defendant could look at the rural Kansas property and cabin location (where D.W.B. would be held captive and tortured).

On the afternoon of June 18, 2024, the UCA, UCA2, and KBI CI met with the defendant at a Topeka, Kansas Auto Auction location. Prior to the meeting, the KBI CI had picked up the defendant in Kansas City, Missouri, and transported him to Kansas so the defendant could see the rural property where D.W.B. would be held captive and tortured. The UCAs, KBI CI, and the defendant all traveled together in an undercover vehicle to a rural property and cabin structure in Wabaunsee County, Kansas. The undercover meeting was audio and video recorded. On the way to rural property, the UCA explained that the UCAs had found a location to keep D.W.B. captive. The defendant said he was just waiting for the UCAs to kidnap D.W.B. and he was anxious for it to occur. The UCA explained that the kidnapping would happen closer to the 4th of July, when fireworks would be prevalent, in case any gun shots were fired during the kidnapping. The UCA reiterated the kidnapping site was in rural Kansas, and not in Kansas City, Missouri, and D.W.B. would be transported across state lines. The UCA asked the defendant how many houses D.W.B. had to sign over. The defendant said he thought D.W.B. had three or four houses, which D.W.B. was putting in other people's names. The defendant also said D.W.B. had a bunch of nice vehicles, including a Dodge Viper, a Chevrolet Camaro, and a couple of Harley Davidson motorcycles. The UCA said if D.W.B. ended up coming up with the money, to make sure the defendant contacted the UCA so the team would not kidnap D.W.B. The defendant said he had been waiting for D.W.B. to pay him, but D.W.B. never paid - other than giving the defendant the tow truck and Dodge Ram truck the defendant provided to the UC as payment for the kidnapping.

Once the UCA approached the rural kidnapping location, the UCA requested the defendant and KBI CI to put on blacked-out glasses/goggles, so they could not determine the property's exact location. Once at the property, the UC asked the defendant and KBI CI to remove the blacked-out sunglasses/goggles. The undercover team walked around the property with the defendant and KBI CI. The property included an outbuilding (with black plastic on the windows), where D.W.B. would be held captive and tortured. The defendant examined the outbuilding and advised that nobody would hear D.W.B. out there. The defendant repeatedly said the property was nice. After visiting the property, the UCA transported the defendant back to Topeka. The UCA told the defendant that after the UCA's group had kidnapped and transported D.W.B. to the rural property, the UCA would pick the defendant up from his Missouri home and take him to D.W.B. Later the same day, the defendant contacted the UC from a new cell phone number of (816) 806-6034.

On the afternoon of June 30, 2024, investigators contacted D.W.B. at his Kansas City, Missouri residence. Investigators informed D.W.B. of his involvement as a victim in a kidnapping-for-hire investigation. D.W.B. agreed to cooperate with investigators. D.W.B. said when he became indebted to the defendant, D.W.B. gave the defendant his home furniture, electronics, money (in the approximate sum of $20,000 USC), his Dodge pickup truck, and a Freightliner brand tow truck. D.W.B. said all of this was given to the defendant to help pay off the drug debt. D.W.B. estimated he probably owed approximately $100,000, but the defendant kept adding interest since it was not being paid fast enough.

On July 1, 2024, the UCA contacted the defendant and advised the UCA had kidnapped D.W.B. and was holding him at the rural location. The UCA picked up the defendant from the defendant's home in Missouri and drove him to the location in Kansas. Once the UCA and defendant arrived at the rural location, law enforcement arrested the defendant.

3.    **Proposed Rule 11(c)(1)(C) Sentence.**  The parties propose, as an appropriate disposition of the case:

    (a)      120 months in prison on Count 1;

    (b)      5 years of supervised release;

    (c)      no fine;

    (d)      the mandatory special assessment of $100.00; and

    (e)      imposition of a forfeiture judgment, as outlined in ¶ 9.

The parties seek this binding plea agreement as an appropriate disposition of the case, because if the Court permits itself to be bound by the proposed sentence, it brings certainty to the sentencing process; it assures that the defendant and the government will benefit from the bargain they have struck; it serves the interests of justice; and it assures a sentence consistent with the sentencing factors of 18 U.S.C. § 3553(a).  If the Court does not agree with the sentence, the defendant and United States may be restored to the positions they maintained prior to reaching this plea Agreement.  This plea agreement centers on the defendant's agreement to enter his guilty plea as soon as the Court's schedule permits, thereby preserving valuable Court, prosecution, defense, United States Probation Office, United States Marshals' Service and other law enforcement resources.

4.    **Application of the Sentencing Guidelines.**  The parties are of the belief that the proposed sentence does not offend the advisory sentencing guidelines.  Because this proposed sentence is sought pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the parties are not requesting imposition of an advisory guideline sentence.

5.    **Government's Agreements.**  In return for the defendant's plea of guilty as set forth herein, the United States agrees to dismiss the remaining counts of the Indictment at the time of

sentencing and agrees to not file any additional charges against the defendant arising out of the facts forming the basis for the present Indictment.

6.    **Consequences for Violating the Plea Agreement.** The United States' obligations under this plea agreement are contingent upon the defendant's continuing to manifest an acceptance of responsibility. If the defendant denies or gives conflicting statements as to his involvement, falsely denies or frivolously contests relevant conduct the Court determines to be true, willfully obstructs or impedes the administration of justice, as defined by U.S.S.G. § 3C1.1 (or willfully attempts to do so), or has engaged in additional criminal conduct, the United States reserves the right to petition the Court for a hearing to determine if he has breached this plea agreement.

If the Court finds by a preponderance of the evidence that the defendant (1) has breached or violated this plea agreement; (2) has willfully obstructed or impeded the administration of justice, as defined by U.S.S.G. § 3C1.1 (or willfully attempted to do so); (3) has engaged in additional criminal conduct; or (4) has otherwise failed to adhere to this plea agreement's terms, this plea agreement will be deemed null and void, and the United States may pursue any additional charges arising from the criminal activity under investigation, as well as any charges for any perjury, false statement, or obstruction of justice that may have occurred.

If the Court finds the defendant has violated this plea agreement, he understands and agrees that all statements he made, any testimony he gave before a grand jury or any tribunal, or any leads from such statements or testimony, shall be admissible against him in any and all criminal proceedings. The defendant waives any rights which might be asserted under the United States Constitution, any statute, Federal Rule of Criminal Procedure 11(f), Federal Rule of Evidence 410, or any other federal rule that pertains to the admissibility of any statements he made subsequent to this plea agreement.

6

7.    **Whether to Accept the Proposed Plea Agreement and Sentence is Up to the Court.** The Court has no obligation to accept the proposed plea agreement and sentence. It is solely within the Court's discretion whether to accept the proposed binding plea agreement as an appropriate disposition of the case.

8.    **Withdrawal of Plea Permitted Only if the Court Does Not Accept the Plea Agreement and Proposed Sentence.** If the Court agrees to be bound by the proposed plea agreement and sentence, the parties shall be bound by all the terms of the proposed plea agreement and the defendant will not be permitted to withdraw his guilty plea. If the Court announces that it will NOT be bound by the proposed plea agreement, the parties agree that at that time either party may withdraw the proposed plea agreement, and if either does so, then all parties will be restored to the positions they were in prior to the entry of the defendant's plea. If neither party elects to withdraw the proposed plea agreement at the time the Court announces that it will not be bound, and before the Court proceeds with sentencing, then the parties shall be bound by all the terms of the proposed plea agreement and the defendant will not be permitted to withdraw his guilty plea.

9.    **Forfeiture of Assets.** The defendant agrees to the forfeiture of the following property to the United States: a FN Five-seveN, 5.7X28mm pistol, bearing serial number DTU3630. The defendant agrees that this property was involved in the commission of Count 1. The defendant knowingly and voluntarily waives his right to a jury trial regarding the forfeiture of property, and voluntarily waives all constitutional, legal and equitable defenses regarding the forfeiture of property and withdraws any administrative claim or petition for remission regarding the property. The defendant acknowledges and agrees that the forfeiture of this property shall not be deemed an alteration of his sentence or this agreement, and shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon him in addition to forfeiture. Additionally, the defendant agrees to the immediate entry of the

7

Preliminary Order of Forfeiture, and agrees to sign any and all documents necessary to effectuate the forfeiture and transfer of his interest and possession of the property identified in this paragraph to the United States prior to the imposition of sentence.

10.    **Payment of Special Assessment.**    The defendant understands that a mandatory special assessment of $100.00 per count of conviction will be entered against him at the time of sentencing.    The defendant agrees to deliver to the Clerk of the United States District Court payment in the appropriate amount no later than the day of sentencing.    The defendant has the burden of establishing an inability to pay the required special assessment.    The parties acknowledge that if the Court finds the defendant is without resources to pay the special assessment at the time of sentencing, the Court may allow payment during his period of incarceration.

11.    **Waiver of Appeal and Collateral Attack.**    The defendant knowingly and voluntarily waives any right to appeal or collaterally attack any matter in connection with this prosecution, his conviction, or the components of the sentence to be imposed herein, as well as the length and conditions of supervised release.    The defendant is aware that 18 U.S.C. § 3742 affords him the right to appeal the conviction and sentence imposed.    By entering into this agreement, the defendant knowingly waives any right to appeal a sentence imposed in accordance with the sentence recommended by the parties under Rule 11(c)(1)(C).    The defendant also waives any right to challenge his sentence, or the manner in which it was determined, or otherwise attempt to modify or change his sentence, in any collateral attack, including, but not limited to, a motion brought under 28 U.S.C. § 2255 (except as limited by *United States v. Cockerham*, 237 F.3d 1179, 1187 (10th Cir. 2001)), or a motion brought under Federal Rule of Civil Procedure 60(b).    In other words, the defendant waives the right to appeal the sentence imposed in this case, except to the extent, if any, the Court imposes a sentence in excess of the sentence recommended by the parties

8

under Rule 11(c)(1)(C). However, if the United States exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), the defendant is released from this waiver and may appeal the sentence received, as authorized by 18 U.S.C. § 3742(a). Notwithstanding the foregoing waivers, the parties understand that the defendant in no way waives any subsequent claims with regards to ineffective assistance of counsel or prosecutorial misconduct.

12.     **FOIA and Privacy Act Waiver.** The defendant waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552. The defendant further waives any rights conferred under the Privacy Act of 1974, 5 U.S.C. § 552a, to prevent or object to the disclosure of records or materials pertaining to this case.

13.     **Full Disclosure by United States.** The defendant understands the United States will provide to the Court and the United States Probation Office all information it deems relevant to determining the appropriate sentence in this case. This may include information concerning his background, character, and conduct, including the entirety of his criminal activities. The defendant understands these disclosures are not limited to the count to which he is pleading guilty. The United States may respond to comments he or his attorney makes, or to positions he or his attorney takes, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement. The defendant also has the right to provide information concerning the offense and to make recommendations to the Court and the United States Probation Office.

14.     **Deportation Consequences.** Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States.

9

Under federal law, a broad range of crimes are removable offenses, including the offense to which he is pleading guilty. Removal and other immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including his attorney or the Court, can predict to a certainty the effect of his conviction on his immigration status. Defendant nevertheless affirms that he wants to plead guilty, regardless of any immigration consequences that his plea may entail, even if the consequence is his automatic removal from the United States.

15.     **Parties to the Agreement.** The defendant understands this plea agreement binds only him and the United States Attorney for the District of Kansas, and that it does not bind any other federal, state, or local prosecution authority.

16.     **Voluntariness of Guilty Plea.** The defendant has had sufficient time to discuss this case, the evidence, and this Plea Agreement with his attorney and he is fully satisfied with the advice and representation his attorney provided. Further, the defendant acknowledges that he has read the Plea Agreement, understands it, and agrees it is true and accurate and not the result of any threats, duress or coercion. The defendant further understands that this Plea Agreement supersedes any and all other agreements or negotiations between the parties, and unless subsequently supplemented in writing with the joint approval of the parties, this Plea Agreement embodies each and every term of the agreement between the parties. The defendant acknowledges that he is entering into this Plea Agreement and is pleading guilty because he is guilty. He further acknowledges that he is entering his guilty plea freely, voluntarily, and knowingly.

Date: 1/22/26

TRENT M. KRUG
Assistant United States Attorney
United States Attorney's Office
500 State Avenue, Suite 360
Kansas City, KS 66101
(913) 551-6730
(913) 551-6541 (fax)

Trent.Krug@usdoj.gov


*s/ D. Christopher Oakley*                              Date:  1.10.26
D. CHRISTOPHER OAKLEY
Assistant United States Attorney
Supervisor
United States Attorney's Office
500 State Avenue, Suite 360
Kansas City, KS 66101
(913) 551-6730
(913) 551-6541 (fax)
Chris.Oakley@usdoj.gov


                                                       Date:  1-22-26
RYAN J. HUSCHKA
Criminal Chief


                                                       Date:  1/23/26

CARLOS NIEBLA-MACHADO
Defendant


                                                       Date:  1/23/26

LYDIA KREBS ALBERT
Federal Public Defender - Topeka
632 SW Van Buren Street, Suite 200
Topeka, KS 66603
(785) 232-9828
(785) 232-9886 (fax)
Email: lydia_krebs_albert@fd.org
Counsel for Defendant Carlos Niebla-Machado


11